# Wilson *versus* Whitaker.

*Measure of damages on contract for delivery of stock.*

In an action on a contract for the sale of specific stock which without the knowledge of the vendor had already been sold to another by his agent, the plaintiff can only recover nominal damages.

ERROR to the District Court of *Philadelphia.*

This was an action of *assumpsit,* by Alexander Wilson against George P. Whitaker.

The plaintiff declared on a contract by defendant to sell and deliver 45 or 47¼ shares of the stock of "Warren Foundry and Machine Shop Company," to which defendant pleaded *non assumpsit.*

Under the ruling of the court below there was a verdict and

[Wilson *v.* Whitaker.]

judgment in favour of plaintiff for $31.51, who thereupon sued out this writ, and assigned for error the several matters mentioned in the opinion of this court. The chief point in controversy was as to the proper measure of damages for the breach of a contract to deliver stock to a purchaser.

All the material facts of the case will be found in the opinion of this court.

*George Junkin*, Jr., and *Edward J. Fox*, for plaintiff.

*J. Otterson*, Jr., and *P. McCall*, for defendant.

The opinion of the court was delivered, February 24th 1865, by

READ, J.—The defendant was the owner of forty-five and one-tenth shares in the Warren Foundry and Machine Shop Company, carrying on business at Phillipsburgh, in New Jersey, opposite Easton. The plaintiff had been president and treasurer of the company, or acting as such until the 13th December 1859. He became a director on the 9th February 1857, and continued in office until the 11th February 1861. The defendant was in business in Philadelphia, and the plaintiff resided at Easton.

It appears that in October 1860 the plaintiff, through an agent, asked the defendant if he had any of this stock for sale, and its prices, and on the 4th December wrote a letter to the defendant, offering to exchange Reading Railroad stock for his forty-five shares in the Warren Foundry, to which the defendant on the 6th replied, he was not willing to exchange, but would sell his stock at a fair rate for cash, or good note at short date. To this letter the plaintiff replied on the 3d, that he wanted a little of that stock for a special purpose, and he knew what he could buy it for, and asking the defendant's selling figures at once, admitting of no change. On the 10th, defendant answered that plaintiff could have his shares at $32.50 per share, cash, or $34 per share, four months' approved paper, payable in par funds at Philadelphia, provided he got his reply by first mail after receipt of this. To this letter the plaintiff replied on the 11th, as follows:—

"I have received yours of yesterday. You ask too much for the stock, if you want to sell. Its highest price was a sale before the suspension at $32.50, and would not now bring within several dollars of that price. If the offer of $32.50, which you had, was from this neighbourhood, it was expecting to *resell* it, and I think the person who *talked of buying* is out of the market, even on time.

"I will give you $32.50 at four months, *acceptable paper*, payable at the Bank of North America, Philadelphia; my endorser or security will be Thomas McKeen, Esq., of Easton,

[Wilson *v.* Whitaker.]

worth $160,000. If you accept my proposition this is my *highest figures*, and above present prices, under all the circumstances. On receipt please accept or reject by telegraph, as I want a decision at once, which will prevent any further propositions on the subject."

This letter went by the afternoon mail, which closed at $2\frac{1}{2}$ o'clock, and arrived in Philadelphia the same evening, and was received at the defendant's place of business the next morning.

On the 4th December, and of course before the receipt of plaintiff's first letter, the defendant had written to Mr. Riegel, a director of the company, authorizing him to sell his stock at $32.50 cash, and accordingly, on the morning of the 11th, between 11 and 12 o'clock, before the meeting of the directors of the company had organized, he sold this stock to James McKeen, another director, for $32.50 cash, and on the next day wrote to the defendant, informing him of the sale. On the evening of the 11th, between $6\frac{1}{2}$ and $7\frac{1}{2}$ o'clock, Mr. James McKeen mentioned to the plaintiff that he had bought Mr. Whitaker's stock from John Riegel. He replied, "you're too late, I have got it," or "have bought it." On the same evening the plaintiff employed Mr. Micke to go to Philadelphia the next day with the following letter, dated Easton, December 11th 1860 :—

"John Micke, Esq., will hand you the note for the stock, and receive the certificates. You can make the transfers on the back of them. I shall probably take up the note in a short time, unless disappointed in receiving money. Please write me before disposing of it.

"Should you desire to know my ability to pay the note, independent of Mr. McKeen, you can inquire of George H. Stuart, Esq., merchant, William A. Porter, Esq., formerly sheriff of Philadelphia, or James, Kent, Santee & Co."

Mr. Micke left Easton at 7 o'clock on the morning of the 12th, with this letter and the note, and got to Philadelphia about 12 o'clock, and called on defendant, and handed him the letter, and told him he came for the stock he had sold Mr. Wilson.

A telegram, dated December 12th 1860, and probably written about 9 o'clock, after Mr. Micke's departure, and before his arrival, was received at Easton, December 12th 1860, 10 o'clock 30 minutes, A. M., in these words :—

"To A. Wilson, Esq.

"I accept your offer for Warren Foundry stock. Yours, truly,
"GEORGE P. WHITAKER."

Upon the trial of the cause the jury found this to be a binding contract, and gave a verdict for the plaintiff, upon which judgment was entered in his favour. This disposes of all the assignments of error, except the first and second, in which there

[Wilson *v.* Whitaker.]

is nothing, and the ninth specification, or assignment of error, which involves the question of the measure of damages, which is really the only matter before us.

In the seventh point the plaintiff's counsel asked the court to charge the jury, " that if from the evidence they find that there was a breach of contract on the part of the defendant, then the measure of damages to which the plaintiff is entitled is the difference between the highest market value of the stock, between the breach and the trial, and the price agreed to be paid for the stock, together with the difference between the interest on the sum to be paid for the stock, from the maturity of the note, which was to have been given for the same, and the value of the dividends made on the stock since the breach," which instruction the court refused to give, and the question is, were they right in so refusing ?

In order to show the amount of damages the plaintiff proved that, on the 11th February 1861, the day the plaintiff resigned his directorship, there was a stock dividend of fifteen per cent. declared ; on the 14th February 1862, another stock dividend of twenty-five per cent. ; and on 14th August 1862, another stock dividend of twenty per cent. on the profits of the previous six months.

It will be recollected that this was a contract for specific stock of the defendant, for which he had paid $50 per share, being its par value, and which, without his knowledge, has been sold by his agent to another person before the plaintiff's letter of the 11th December, containing his offer, had been mailed.

The contention on the part of the plaintiff was, that this case was ruled by The Bank of Montgomery *v.* Reese, 2 Casey 143. That case was rightly decided, and whenever a similar case occurs, we shall be governed by it. But this does not include *dicta* or expressions of opinion, which were not essential to the decision, and which were clearly extra-judicial. " The corporation," says C. J. Lewis, " was trustee for the stockholders, but in disregard of the duties of the trust, in distributing this stock, it deprived Mr. Reese of the number of shares to which he was entitled." The moment, therefore, that you establish the relation of trustee and *cestui que trust* between the bank and its stockholder, the latter is entitled either to have the specific article, as of the day on which it should have been delivered to him, or its highest price with all dividends declared upon it. This is formed upon the ordinary rule in equity, that a trustee shall not put into his own pocket any of the profits arising from the trust estate. This is all that was decided in The Bank of Montgomery *v.* Reese.

The present case is not of replacing borrowed stock, or where money has been paid in advance, but is the simple case of a contract to sell specific stock, which, without the knowledge of the

[Wilson *v.* Whitaker.]

vendor, had been already sold by his agent. This is not the case of trustee and *cestui que trust*, as in 2 Casey, but is that of an ordinary contract to sell an article which had been already disposed of. The court below were therefore right in refusing to charge the jury as requested by the plaintiff's counsel.

The plaintiff, before his offer was accepted, declared to the purchaser of the stock that he had bought it, and the same evening employed an agent to complete the ·purchase the next day, before the defendant was apprised of the prior sale. The agent also left Easton for Philadelphia before the offer of the plaintiff was accepted, or was in the hands of the defendant. Under these circumstances the plaintiff was clearly entitled only to nominal damages, in which light the present verdict is considered, and we therefore think the judgment should be affirmed.